UNITED STATES, Appellant,

v.

Richard J. KOSSMAN, Private U.S.
Marine Corps, Appellee.

No. 93–6002.
CMR No. 92 2486–m.

U.S. Court of Military Appeals.

Argued May 11, 1993.

Decided Sept. 29, 1993.

For Appellant: *Captain A. Diaz,* USMC (argued); *Colonel T.G. Hess,* USMC and *Lieutenant Commander S.A. Stallings,* JAGC, USN (on brief).

For Appellee: *Lieutenant Michael C. Pallesen,* JAGC, USNR (argued).

*Opinion of the Court*

COX, Judge:

In this case, we are called upon to revisit the speedy-trial rights of accused servicemembers who are confined pending court-martial. Here the military judge granted *in limine* a defense motion to dismiss certain of the charges and specifications on the grounds of denial of speedy trial. The Government appealed to the Court of Military Review pursuant to Article 62, Uniform Code of Military Justice, 10 USC § 862 (1983). A majority of that court agreed with the military judge and affirmed.

■ The Judge Advocate General of the Navy then certified this question to us:
WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW CORRECTLY DETERMINED THAT THE MILITARY JUDGE WAS BOUND TO APPLY THIS COURT'S HOLDING IN *UNITED STATES V. BURTON,* 21 USCMA 112, 44 CMR 166 (1971), IN RESOLVING APPELLEE'S SPEEDY TRIAL MOTION INSTEAD OF THE PRESIDENT'S COMPREHENSIVE SPEEDY TRIAL SCHEME CONTAINED IN RCM 707.

*See* Art. 67(a)(2), UCMJ, 10 USC § 867(a)(2)(1989).

The Sixth Amendment to the Constitution declares, *inter alia:*

> In all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial.

In the instant case, as to the affected charges and specifications, the military judge found that only 8 of the 110 days of the accused's pretrial confinement were accountable to the defense; the balance were chargeable to the Government. The judge concluded that this pretrial interval did not violate the accused's Sixth Amendment right to a speedy trial. *See Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Neither party disputes the correctness of the judge's computations or his conclusions of law regarding the Sixth Amendment.

For servicemembers, however, it has long been assumed that Article 10, UCMJ, 10 USC § 810, imposes a more stringent speedy-trial standard than that of the Sixth Amendment. *United States v. Burton*, 21 USCMA 112, 117, 44 CMR 166, 171 (1971). Article 10 provides, in relevant part:

> When any person subject to this chapter is placed in arrest or confinement prior to trial, *immediate steps shall be taken* to inform him of the specific wrong of which he is accused and to try him or to dismiss the charges and release him.

(Emphasis added.)

Pointedly, however, the drafters of Article 10 made "no provision as to hours or days" in which a case must be prosecuted because "there are perfectly reasonable exigencies that arise in individual cases which just do not fit under a set time limit." Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess. 906 (1949) (testimony of Mr. Larkin, Assistant General Counsel, O.S.D.), *reprinted in* Index and Legislative History, Uniform Code of Military Justice (1950).

In *United States v. Burton*, 21 USCMA at 118, 44 CMR at 172, we

adopt[ed] the suggestion of appellate defense counsel that in the absence of defense requests for continuance, a presumption of an Article 10 violation will exist when pretrial confinement exceeds three months. In such cases, this presumption will place a heavy burden on the Government to show diligence, and in the absence of such a showing the charges should be dismissed.

(Footnote omitted.) Thus the *"Burton* presumption" was conceived as a mechanism to enforce Article 10. Several years later, we modified the *Burton* period from 3 months to 90 days. *United States v. Driver*, 23 USCMA 243, 49 CMR 376 (1974).

This *Burton–Driver* 90–day presumption was the basis of the military judge's ruling that a speedy-trial violation occurred herein and upon which he based his dismissal of the affected charges and specifications with prejudice. The judge's application of this presumption was the basis of the challenge by the Government in its Article 62 appeal; and the presumption's continued vitality was the ground the Court of Military Review majority used in sustaining the judge's ruling.

At the time of *Burton*, the Manual for Courts–Martial contained no mechanistic speedy-trial template, but only general guidance as to matters to be taken into consideration by the military judge. This is hardly surprising, given the drafters' unambiguous intent, Hearings on H.R. 2498, *supra*. The Manual factors included

> whether the accused has earlier demanded trial and, if so, when; whether any portion of the delay was at the instance of the defense; how much time was reasonably required for pretrial processing, investigation, and preparation; whether the delay or any part thereof was arbitrary or oppressive; and whether the accused was in pretrial restraint and, if so, the nature of that restraint.

Para. 215*e*, Manual for Courts–Martial, United States, 1969 (Revised edition). Essentially, these factors correspond to those identified in *Barker v. Wingo*, 407 U.S. at

523, 92 S.Ct. 2188, for the Sixth Amendment.

Despite its lofty purpose, the *Burton* presumption was admittedly something of a crude stopgap; and it occasionally created difficult results.[1] Because a *Burton* presumption was rebuttable, however, we plainly acknowledged that unique circumstances could arise which would justify or excuse longer delays in bringing an accused to trial.

Since *Burton*, several key changes have been instituted in the pretrial confinement area. First, a "military magistrate" system has been implemented throughout the armed forces. RCM 305(i)(2), Manual for Courts–Martial, United States, 1984. The result is that, pending courts-martial, military magistrates and judges now hold keys to confinement facilities and brigs, not just commanders. RCM 305(i)(5) and (j)(1). Second, all pretrial confinement served is now credited against any sentence to confinement ultimately adjudged, and additional credit is given for pretrial confinement subsequently determined to have been unlawful. *United States v. Allen*, 17 MJ 126 (CMA 1984); RCM 305(j)(2) and (k).

In addition, in 1984, the President, through RCM 707 promulgated extensive procedural rules relating to the right to a speedy trial. The original RCM 707, however, closely approximated the *Burton–Driver* presumption as pertains to pretrial confinees. It provided:

> When the accused is in pretrial arrest or confinement ..., immediate steps shall be taken to bring the accused to trial. No accused shall be held in pretrial arrest or confinement in excess of 90 days for the same or related charges. Except for any periods under subsection (c)(7) [delay arising because of a joint trial] of this rule, the periods described in subsection (c) [enumerating specific circumstances justifying relief of the Government from accountability for delay] of

this rule shall be excluded for the purpose of computing when 90 days has run. The military judge may, upon a showing of extraordinary circumstances, extend the period by 10 days.

Like *Burton*, the original RCM 707(e) provided for dismissal as the exclusive remedy for an RCM 707 violation.

In the only 90–plus–days cases we have found in which we addressed this provision, we concluded that the particular periods of time that satisfied the RCM 707 exclusions also overcame the *Burton* presumption. *United States v. Carpenter*, 37 MJ 291, 299 (CMA 1993); *United States v. King*, 30 MJ 59, 66 and n.7 (CMA 1990). Accordingly, we had no occasion to decide whether RCM 707 and *Burton* were in any way inconsistent or incompatible.

Effective July 6, 1991, the President's most recent amendments to RCM 707 were substantial. Most particularly, the 90–day rule for pretrial confinees was extended to a 120–day rule, and the military judge was given discretion to dismiss charges with or without prejudice to the Government for violations of RCM 707. RCM 707(a) and (d). This version of RCM 707 was in effect at the time of appellant's trial—hence the contention over whether RCM 707 or *Burton* predominates with respect to the accused's 102–day pretrial confinement.

In Article 36(a), UCMJ, 10 USC § 836(a), Congress delegated to the President the authority to prescribe "[p]retrial, trial, and post-trial procedures" for courts-martial. Plainly, RCM 707 is an exercise of that delegation and has the force and effect of law. *See United States v. Smith*, 13 USCMA 105, 119, 32 CMR 105, 119 (1962). Any violation of RCM 707 is subject to the remedies provided therein.

■■■ The President, however, cannot overrule or diminish an Act of Congress via the promulgation of rules of procedure. Likewise, the President cannot overrule or

---

**1.** *See United States v. Henderson*, 1 MJ 421 (CMA 1976) (conviction of murder and conspiracy to murder set aside by operation of a *United*

*States v. Burton*, 21 USCMA 112, 44 CMR 166 (1971), presumption upon 113 days' pretrial confinement attributable to Government).

diminish our interpretation of a statute.[2] Thus, in the area of subconstitutional speedy trial, Article 10 reigns preeminent over anything propounded by the President. If the requirements of Article 10 are more demanding than a presidential rule, Article 10 prevails. Merely satisfying lesser presidential standards does not insulate the Government from the sanction of Article 10. The 102–day government delay in the instant case apparently satisfies RCM 707. The question remains, however, does it satisfy Article 10?

Before resolving that, we reiterate that the *Burton* presumption was court-made and declared in a procedural vacuum, without the benefit of presidential input. Just as we created it, we now reconsider it. *Burton* and *Driver* are hereby overruled. The landscape of speedy trial has changed dramatically since those cases, and the President has acted responsibly in an area in which he has clear authority. Our rough-and-ready rule of thumb (the *Burton* Rule) now merely aggravates an already complicated subject.

■ Nevertheless, it is claimed that, even if we overrule *Burton*, the accused should be entitled to the "benefit" of the *Burton* presumption because his case "arose" under it. We reject this contention. First, *Burton* was a tool for effectuating Article 10. The accused's "right" is to have Article 10, not a "court-made" presumption, vindicated. Second, there can be no contention that the accused relied to his detriment on the *Burton* presumption. It can hardly be maintained that he conducted his affairs in such a manner that, should he wind up in pretrial confinement, he could be assured of remaining there no more than 90 days chargeable to the Government. Cf. *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (new Constitutional rule applies retroactively to all cases state and federal which are

pending on direct review even if rule is a "clear break" with the past).

Reasonable persons may well debate the wisdom of the *Burton* presumption in any event. Undoubtedly it had the effect of assuring that few accused would remain in pretrial confinement longer than 90 days attributable to the Government; but it also had a reverse effect. In practice, it virtually assured that no accused could ever prevail on an Article 10 motion if the pretrial confinement chargeable to the Government was less than 90 days. We happen to think that 3 months is a long time to languish in a brig awaiting an opportunity to confront one's accusers, and we think Congress thought so, too. Four months in the brig is even longer. We see nothing in Article 10 that suggests that speedy-trial motions could not succeed where a period under 90—or 120—days is involved. At the same time, we recognize that there are many circumstances that justify even longer periods of delay. However, where it is established that the Government could readily have gone to trial much sooner than some arbitrarily selected time demarcation but negligently or spitefully chose not to, we think an Article 10 motion would lie.[3]

We do not apprehend that military judges will approach the Article 10 mandate to take immediate steps in a mean-spirited fashion. Undoubtedly, military judges are far more sensitive than are we to the realities of military practice. Some cases are obviously more convoluted than others and necessarily take longer to process. In addition, the logistical challenges of a world-wide system that is constantly expanding, contracting, or moving can at times be daunting. Often operational necessities add a further layer of complexity unimagined by the civilian bar. Even ordinary judicial impediments, such as crowded dockets, unavailability of judges, and attor-

---

**2.** In *United States v. Burton,* 21 USCMA 112, 44 CMR 166 (1971), we were not purporting to interpret Article 10, but to enforce it.

**3.** The Government should not rely exclusively on RCM 707, Manual for Courts–Martial, United States, 1984, as the "know-all, be-all" of speedy-trial issues; but RCM 707 does provide good guidance to both the Bench and Bar.

ney caseloads, must be realistically balanced.

For want of a better verbal formula, the pre-*Burton* standard of "reasonable diligence" seems appropriate. In *United States v. Tibbs*, 15 USCMA 350, 353, 35 CMR 322, 325 (1965) (55-day delay from pre-charge confinement to trial not unreasonable), we said:

> It suffices to note that the touch stone for measurement of compliance with the provisions of the Uniform Code is not constant motion, but reasonable diligence in bringing the charges to trial. Brief periods of inactivity in an otherwise active prosecution are not unreasonable or oppressive.

(Citations omitted.)

We are mindful, moreover, that a speedy trial is not always seen as being in the best interest of the defense. *See Barker v. Wingo*, 407 U.S. at 526, 92 S.Ct. at 2190. Stratagems such as demanding a speedy trial now, when the defense knows the Government cannot possibly proceed, only to seek a continuance later, when the Government is ready, may belie the genuineness of the initial request. "Like most rights, speedy trial can be waived." *United States v. King*, 30 MJ at 66.

Inasmuch as the delay in this case has not been tested for compliance with Article 10, we remand it to the military judge for that initial determination. Whether Article 10 was violated is the question, not the given. Article 10 does not require instantaneous trials, but the mandate that the Government take immediate steps to try arrested or confined accused must ever be borne in mind. If our decision today vests military judges with a degree of discretion, so be it. Judges who can decide difficult questions such as whether a confession was voluntary, *see United States v. Martinez*, 38 MJ 82 (CMA 1993), can readily determine whether the Government has been foot-dragging on a given case, under the circumstances then and there prevailing.

■ The remedy for an Article 10 violation must remain dismissal with prejudice of the affected charges. If it is concluded that the circumstances of the delay are sufficiently excusable or unavoidable as to permit a reinstitution of the charges, there is no violation of Article 10 in the first place. Where the circumstances of delay are not excusable, on the other hand, it is no remedy to compound the delay by starting all over.

The certified question is answered in the negative.

The decision of the United States Navy–Marine Corps Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Navy for resubmission to the convening authority for further proceedings at trial.

Judges CRAWFORD and GIERKE concur.

SULLIVAN, Chief Judge (dissenting):

*United States v. Burton*, 21 USCMA 112, 44 CMR 166 (1971), and *United States v. Driver*, 23 USCMA 243, 49 CMR 376 (1974), provide well-recognized substance and regularity to speedy-trial practice under Article 10, UCMJ, 10 USC § 810. The majority opinion today eviscerates this body of military speedy-trial law in favor of essentially unreviewable ad hoc decisions by military trial judges. The result is chaos, and I for one will not condemn the military legal community to reinvent our speedy-trial clock, second by second.

WISS, Judge (dissenting):

Today, a bare majority of this Court throws onto the legal trash heap a standard "for determining compliance with" the speedy-trial mandate of Article 10 [1] that has served, and served well, the military justice system for more than two decades. It is a standard devised and applied without undue difficulty by various combinations of no fewer than 10 Judges of this Court and by countless judge advocates. *See United*

1. Art. 10, Uniform Code of Military Justice, 10 USC § 810.

*States v. Burton,* 21 USCMA 112, 117–18, 44 CMR 166, 171–72 (1971). In its place— as guidance to practitioners at all levels of this legal system so that meaningful understanding and application of this statutory imperative can be assured—the majority provides ... nothing. Viewed from virtually any angle, this looks to me like a step backwards. Accordingly, I dissent.

## I. *BURTON:* TRIED AND PROVEN

### A

In part relevant to this appeal, Article 10 instructs:

> When any person subject to this chapter is placed in arrest or confinement prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or to dismiss the charges and release him.

Most of the language of this provision is unambiguous: It is directive, not hortative; its focus of concern is accused persons "in arrest or confinement" prior to trial, persons constitutionally cloaked with a presumption of innocence; and the alternatives are finite—"try him or ... dismiss the charges and release him."

One portion of the language, however, proved to be anything but unambiguous: the charge to take "immediate steps" toward one of the two alternatives. In fact, the legislative history of Article 10 indicates that the question of what constitutes "immediate steps" was consciously acknowledged by Congress to be ambiguous. Congress eschewed drawing a time line in the sand, recognizing, as the majority points out, that "there are perfectly reasonable exigencies that arise in individual cases which just do not fit under a set time limit." Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess. 906 (1949), *reprinted in* Index and Legislative History, Uniform Code of Military Justice (1950).

The consequence of this well-intended ambiguity, however, was that, over the first 20 years of experience under Article 10, there was little predictability in this area of frequent litigation. Precisely *be-cause* each individual case involves its own idiosyncratic potholes in its path to trial, the decisions on whether Article 10 was violated were largely ad hoc, with insubstantial value as a corpus of precedent. One has only to read from the commentary of the time to flavor the real individualism of the reported cases—indeed, being individualistic to a fault, in terms of offering any meaningful benchmarks for practitioners on what constitutes "immediate steps." *See, e.g.,* Tichenor, *The Accused's Right to a Speedy Trial in Military Law,* 52 Mil. L.Rev. 1 (Spring 1971). The author of this article noted at the outset, "The right of a military accused to a speedy trial is a concept which has generated a great deal of confusion." Subsequently, referring to language in some of the cases of the day, he observed:

> The use of words such as "reasonable diligence," "oppressive," "due process," "fair trial," and "prejudiced" substantiate the extreme difficulty in trying to establish a fixed rule to determine whether the accused was or was not denied his rights by a particular delay.

*Id.* at 28. In this same note, he concluded:

> The standards used in measuring the fairness of the proceedings affected by pretrial delays are general in nature and offer very little help in formulating any specific rule to be applied to all factual situations. Whether or not the Government has proceeded with reasonable diligence is a subjective concept and varies depending on the attendant facts and circumstances.

\* \* \*

After a careful examination of the cases dealing with issues of speedy trial, it becomes evident that the formulation of any specific rule or guidance is almost impossible. It is perhaps this difficulty that partially explains the growing concern in the military that unless an accused is brought to trial within one or two months from the date of the commission of the offense there is a substantial

possibility that the accused will have been denied a speedy trial.

*Id.* at 46–47, 49.

## B

Against this backdrop of uncertainty of the law, there is little wonder that the *Burton* Court—considering an issue not raised by the accused but instead specified by the Court itself—accepted appellate defense counsel's urging "to promulgate new guidance for determining compliance with the speedy trial provisions of the Sixth Amendment and Articles 10, 30(b), and 33, Uniform Code of Military Justice, 10 USC §§ 810, 830, and 833." 21 USCMA at 117, 44 CMR at 171. Notwithstanding what might be inferred from some critics of that opinion, the *Burton* Court expressly remained true to the intent of Congress to not fix an inflexible time line for that process. *United States v. Sloan,* 22 USCMA 587, 588, 48 CMR 211, 212 (1974). Referring to *United States v. Hounshell,* 7 USCMA 3, 21 CMR 129 (1956), the *Burton* Court recalled:

> The opinion ... reviewed the legislative history of Article 10 and concluded that Congress had not adopted the practice of some States under which an accused is automatically discharged if he is not brought to trial within a specified time after being charged. That history remains unchanged. For that reason we are hesitant to apply rigid time limits. Each case still must depend on its own facts and circumstances. *See United States v. Goode,* 17 USCMA 584, 586, 38 CMR 382 (1968).

21 USCMA at 118, 44 CMR at 172.

Thus, the Court sought to maintain allegiance to this congressional intent while, at the same time, to answer the plea to articulate meaningful guidance to help practitioners understand and predict application of Article 10 to any given case.[2] The Court's response was a standard that 1) anticipated that all of the various relatively *usual* difficulties in getting a case to trial could be overcome within 3 months[3] and that 2) permitted the Government, in the truly *unusual* case, to spend whatever reasonable additional time that it could show was necessary to meet the unique circumstances demanded by that case. In the words of the Court:

> For offenses occurring after the date of this opinion ... we adopt the suggestion of appellate defense counsel that in the absence of defense requests for continuance, a presumption of an Article 10 violation will exist when pretrial confinement exceeds three months. In such cases, this presumption will place a heavy burden on the Government to show diligence, and in the absence of such a showing the charges should be dismissed.

*Id.* (footnote omitted).

Thus was the beauty of the *Burton* standard for measuring compliance with the congressional mandate to take "immediate steps" to process charges, one way or the other, against pretrial confinees. With one stroke, most of the typical and comparatively short delays about which parties might have carped at trial and on appeal prior to *Burton* were subsumed within the assumed reasonable period of 90 days; all that was left for litigation, then, were the atypical delays that rear up only in cases with extraordinary circumstances. *See United States v. Marshall,* 22 USCMA 431, 435, 47 CMR 409, 413

2. Rules of presumption in connection with statutory mandates are not unique in our jurisprudence to Article 10. *See, e.g. United States v. Payne,* 3 MJ 354 (CMA 1977) (presumption of prejudice from an Article 32(a) violation—investigating officer failing to act as an impartial investigator and acting in violation of applicable standards of conduct for the judicial office he served); *United States v. Coulter,* 3 USCMA 657, 14 CMR 75 (1954) (presumption of prejudice

from an Article 6(c), 10 USC § 806(c) violation—same officer serving as trial counsel and as staff judge advocate to the reviewing authority).

3. Three years later, the Court substituted a 90-day standard for the original 3-month standard in order to offer uniformity, given the vagaries of the calendar. *See United States v. Driver,* 23 USCMA 243, 49 CMR 376 (1974).

(1973). The *Burton* Court's response to the urging for guidance at last offered lawyers and judges at all levels some hope for predicting how Article 10 might apply to individual cases.

In practice, the standard has well served the fundamental principles of speed and simplicity in the administration of justice that have long made military law worthy of respect and imitation. *See* W. Winthrop, *Military Law and Precedents*, Preface to First Edition of 1886. Some rough measure of its effectiveness may be seen in the fact that a computer analysis of all appellate decisions in the military justice system since 1951 reveals over 1,000 cases in which "speedy trial" was mentioned; in comparison, a similar analysis reveals only about 250 cases in which the *Burton* case was cited since 1971. Also of interest is the fact that a computer analysis of this Court's decisions from 1972 to the present indicates that, in the first 11 years following publication of *Burton*, that opinion was cited in 46 cases, 29 of which were in the first 5-year period; in the last 11 years, it was cited in only 13 cases.

This would appear to offer some support for observing that, after an initial few years involving litigation to determine the nature of the extraordinary circumstances that would justify delay beyond 90 days, the standard fulfilled the hope of offering predictability and simplicity of application of the statute. In this light, obviously I do not share the majority's deprecative view of the *Burton* presumption as being "admittedly something of a crude stopgap," 38 MJ at 260, and as a "rough-and-ready rule of thumb," 38 MJ at 261. I see absolutely no hint in *Burton* itself to indicate such a view of their handiwork by my judicial predecessors in 1971, and I have read noth-

ing in this Court's subsequent opinions to that effect, either.

## II. *KOSSMAN:* WHAT'S LEFT?

I am confident that my colleagues in the majority, no less than the Judges who formulated the *Burton* standard, are concerned with assuring the benefits, both to accused persons and to society as a whole, of speedy trial of criminal charges.[4] It is fair, therefore, to consider what is left, by way of assuring those benefits, with the demise of the *Burton* standard.

### A

Preliminarily, I suppose, one might consider what the majority refers to as "several key changes ... instituted in the pretrial confinement area" since *Burton*. 38 MJ at 260. It is true that, by virtue of this Court's decision in *Courtney v. Williams*, 1 MJ 267 (CMA 1976), military magistrates now decide whether an accused can and should be detained pretrial. *See* RCM 305(i)(5) and (j)(1), Manual for Courts–Martial, United States, 1984. It is true also that, again by decision of this Court, a convicted accused receives credit on the adjudged sentence for pretrial confinement, with additional credit if the confinement is determined by the military judge to have been unlawful. *United States v. Allen*, 17 MJ 126 (CMA 1984). *See* RCM 305(j)(2).

As important as these advances in the law are, however, they can only reasonably be categorized as *complements* of an effective speedy-trial mechanism, not in any way as diminishing the need for such a protection. The *Courtney* decision, for instance, assures the pretrial release of all except those whose confinement is absolutely necessary and, in this manner, seeks to minimize the prejudice to military accused from the absence of any opportunity for bail, an

---

4. If ever the law is to have genuine deterrent effect on the criminal conduct giving us immediate concern, we must make some drastic changes. The most simple and obvious remedy is to give the courts the manpower and tools ... to try criminal cases within sixty days after indictment, and then see what happens.... Indeed the delays in trials are often one of the gravest threats to individual rights.

Both the accused and the public are entitled to a prompt trial.

Chief Justice Warren Burger, State of the Judiciary Address, American Bar Association Annual Meeting, St. Louis, August 1970, reprinted in 56 ABAJ 929, 932 (1970), and subsequently reprinted in Tichenor, *The Accused's Right to a Speedy Trial in Military Law*, 52 Mil.L.Rev. 1 (Spring 1971).

opportunity that is constitutionally guaranteed to civilian criminal defendants under the Eighth Amendment. *Courtney v. Williams, supra* at 270–71. Nonetheless, it in no way compensates for what was *Burton*'s protection of those who are left in confinement.

Similarly, while *Allen* assures convicted accused ultimate credit for pretrial confinement, it does nothing for the accused who is acquitted and thus receives no sentence to confinement; and it represents only a partial "remedy" for an accused whose sentence to confinement does not extend to the length of the pretrial confinement served. Thus, this back-end "remedy" for pretrial confinement is not an effective substitute for a front-end mechanism for assuring compliance with Article 10's speedy-trial mandate.

Besides these inadequacies from the standpoint of an accused, it must be recognized forthrightly that there is *no* substitute for the benefits to the military community and to society as a whole from speedy disposition of criminal charges. *See United States v. Sloan, supra* at 588, 48 CMR at 212. There are no winners when criminal trials are unnecessarily delayed; all are losers.

### B

The speedy-trial promise of the Sixth Amendment to the Constitution remains unaffected by today's decision. Aside from observing that, in over 40 years of reported decisions of this Court, *none* has found a violation of the Sixth Amendment, the following analysis is apropos:

Like his or her civilian counterpart, the armed forces member is guaranteed a speedy trial under the sixth amendment. *That right, however, given its present Supreme Court interpretation, is mostly illusory.*

F. Gilligan and F. Lederer, *Court–Martial Procedure* (hereafter Gilligan & Lederer) § 17–10.00 at 622–23 (1991) (footnotes omitted; emphasis added). The authors continue:

Consequently, the military member is particularly fortunate in that the constitutional right is significantly buttressed by additional protections stemming primarily from Article 10 of the Uniform Code of Military Justice and the Rules for Courts–Martial.

*Id.* at 623. With this lead, I proceed.

### C

Article 10 remains, of course. The viability of this statutory charge theoretically is unaffected by today's decision. Its practical viability may be more suspect, however. Even the majority recognizes that the pre-*Burton* state of implementation of Article 10's speedy-trial mandate was a "procedural vacuum." 38 MJ at 261. Yet, by its decision today, the majority has doomed practitioners to the fate of precisely the same *"pre-Burton* standard of 'reasonable diligence' " that eventually drove this Court to issue the *Burton* decision in the first place. *Compare* 38 MJ at 262 *with United States v. Tibbs*, 15 USCMA 350, 353, 35 CMR 322, 325 (1965). I cannot imagine what makes that standard any more satisfactory today than it was in 1971. Thus, it would surely seem that the Chief Judge has hit the nail on the head when he chastizes the majority today for "condemn[ing] the military legal community to reinvent our speedy-trial clock, second by second." 38 MJ at 262.

Morever, it would not seem to bode well post-*Kossman* that the authors of *Court–Martial Procedure* quoted earlier liken the pre-*Burton* speedy-trial analysis by this Court to the Supreme Court's effort to test for violation of the Sixth Amendment, *see* Gilligan & Lederer, *supra* § 17–41.20 at 636–37. These are the same authors who, as I have noted, evaluate the latter protection as "mostly illusory." Instead, they opine that "at present Burton is the ultimate judicial protection of the statutory military right to a speedy trial." *Id.*, § 17–20.00 at 625. At least it was until today.

### D

Finally, I come to the provision that seems most heavily relied upon by the ma-

jority as permitting its burial of the *Burton* standard: RCM 707. Before considering its effectiveness to assure speedy trials, however, I am impelled to pause briefly to comment on the majority's lackluster defense of this Court's responsibility and authority in this area versus that of the President.

The President's instruction in RCM 707 to bring a case to trial within 120 days of a certain triggering event does have, as the majority states, "the force and effect of law." 38 MJ at 260. First, the President may order such an action as the Commander in Chief. *See* U.S. Const. art. II, § 2. Second, the rule is related to the President's statutory prerogative to prescribe "[p]retrial, trial, and post-trial procedures." *See* Art. 36(a), UCMJ, 10 USC § 836(a); *United States v. Smith*, 13 USCMA 105, 119, 32 CMR 105, 119 (1962).

Nonetheless, the substantive due process question of whether a confined criminal accused has received his congressionally assured speedy trial under Article 10 is uniquely within the responsibility and the authority of the judiciary. The majority's implied distinction in this regard between "interpretation of a statute" and "enforce[ment]" of it is a word game that is ineffective to dismiss the clearly expressed fact that the *Burton* Court's new standard was "guidance for determining compliance with the speedy trial provisions" of, in part, Article 10. 21 USCMA at 117, 44 CMR at 171. *See United States v. Kossman*, 37 MJ 639, 640–41 (NMCMR 1993). Accordingly, any way that one slices that pie, the *Burton* standard was a means to measure whether Article 10's due process was fulfilled in any given case, and it is most assuredly not within the power of any authority other than the Supreme Court of the United States to overrule that standard or this Court to reconsider it. *See also* Art. 36(a) (President's rules of procedure "may not be contrary to or inconsistent with this chapter").

That said, it is appropriate now to consider the persuasiveness of the majority's con-clusion that RCM 707 adequately protects speedy-trial interests so as to permit reconsideration—and, upon reconsideration, interment—of the *Burton* standard. I must confess that—while fully hopeful that I am wrong, considering my evaluation of the efficacy of the Sixth Amendment and the "reasonable diligence" standard for measuring compliance with Article 10—I have serious misgivings about the capacity of that rule to fill the void caused by overruling *Burton*.

First, in view of the lack of ballast in the rule's principal components since its inception in 1984, I must wonder about the sternness of the resolve of future scriveners of the rule to provide real substance to a speedy-trial mandate. I point to the following unexceptionally weakening trend in the fundamental, unpinning elements of the rule:

*Time period:* The rule originally was promulgated in 1984 as a general 120–day rule but with a specific 90–day rule for accused persons in pretrial confinement-*see* RCM 707(a) and (d); most recently, however, the latter was deleted—Exec. Order 12767, § 1g, 56 Fed. Reg. 30288–30292 (1991).

*Triggering events:* The events that start the running of the clock have been modified in several respects. *See* RCM 707(a) (Changes 2 (1 Mar 86), 3 (12 Mar 87), and 5 (6 Jul 91)).

*Exclusions:* Periods to be excluded from the allotted time under the rule were so numerous and expansive that they riddled the rule so as to overwhelm it. *See* 707(c). Recently the host of specific exclusions was deleted from the rule and, instead, there is a general provision requiring that requests for pretrial delay must be submitted for approval of the convening authority or the military judge—RCM 707(c) (Change 5); it is noteworthy that this most recent vintage of RCM 707(c) gives absolutely no guidance at all on what requests properly should be granted by those authorities, however.

*Remedy:* The remedy for violating the rule originally was dismissal, which the Drafters' Analysis, Manual, *supra* at A21–38, made clear was intended as dismissal with prejudice. The most current version, however, permits dismissal with or without prejudice, depending on the circumstances. *See* RCM 707(d) (Change 5).

(This is not a quotation.)

Second, apart from the squeamishness in confidence caused by this course with an apparent bearing on impotence, the substance of a couple of these changes causes additional wariness. One of these is in the length of the speedy-trial clock and what that signifies. After discussing the decision in *United States v. McCallister,* 27 MJ 138 (CMA 1988), in which the Court relied in part on *Burton*'s 90–day rule to decide that the "demand prong" of *Burton*[5] "no longer serves a useful function as a distinct means to the end of a speedy trial," *id.* at 140, the authors of *Court–Martial Procedure* wrote:

> The *McCallister* opinion does more than justify the overruling of the *Burton* demand prong. It makes abundantly clear that the *Burton* ninety-day dismissal rule not only continues but is a valuable part of the speedy-trial protections. . . .
>
> *    *    *
>
> Having abandoned the demand prong of *Burton,* would the court find the Rules an adequate substitute for the ninety-day dismissal rule? This issue should now be presented as the Manual for Courts–Martial has been amended so as to delete *its* ninety-day rule in favor of a general 120–day rule.
>
> The history of the speedy-trial right in the armed forces has usually been a history of the reaction of the military appellate courts to inadequate compliance with

the Article 10 right. Given amendment to Rule 707's decrease[d] speedy trial protections, one would predict not only renewed emphasis on the ninety-day rule, but also the now jettisoned demand prong as well.

Gilligan & Lederer, *supra* § 17–57.00 at 654–55 (footnotes omitted). Today, in the face of obviously reduced protection in RCM 707, the majority has "react[ed]" by reducing, as well, any real chance for compliance with Article 10. So much for predictions!

The other change that is substantively bothersome is in RCM 707(c), which formerly contained the list of excludable periods. Commenting on the utter lack of any indications at all in the rule as to what are appropriate requests to be granted under the new, open-ended version of the rule, the authors of *Court–Martial Procedure* predict:

> Either the common law resulting from this amendment will simply restate the old Rule and its interpretation, or it will justify its departure. Given the service's traditional hostility to an effective speedy-trial right and the Discussion's attempt to grant "sole discretion" to the convening authority or judge, the amendment may make a mockery of the Rule.

Gilligan & Lederer, *supra,* § 17–73.10 at 667. I fear as much myself—not that the "old Rule," with its all-engulfing specific exclusions, was any less of an undermining of meaningful speedy-trial protection.

This, then, is what the rule looks like that the majority finds so assuaging that it is persuaded today of no continuing need for the *Burton* 90–day standard to ensure compliance with Article 10. I am not so impressed.

### III.  BACK TO THE FUTURE

As of this decision today, a military accused's speedy-trial assurance rests not so

---

**5.** In addition to the 90–day rule, *United States v. Burton,* 21 USCMA 112, 118, 44 CMR 166, 172 (1971), also contained the following "demand-prong":

> Similarly, when the defense requests a speedy disposition of the charges, the Govern-

ment must respond to the request and either proceed immediately or show adequate cause for any further delay. A failure to respond to a request for a prompt trial or to order such a trial may justify extraordinary relief.

solidly on the "mostly illusory" Sixth Amendment; on Article 10 and the same frustrating "reasonable diligence" standard to measure compliance with it that existed for 20 years prior to *Burton* and which the majority acknowledges was part of a "procedural vacuum"; and on RCM 707—a 120–day clock, with wholly undefined and facially limitless bases for exclusions from that clock, and with a remedy for violation of dismissal either with or without prejudice. Thus viewed, regardless of the majority's evaluation, it surely does not seem to me that "[t]he landscape of speedy trial has changed dramatically since" (38 MJ at 261) *Burton*—certainly, at least, not for the better.

When this Court several years ago overruled a similar 90–day post-trial rule for action by the convening authority that had been announced in *Dunlap v. Convening Authority*, 23 USCMA 135, 48 CMR 751 (1974), the Court subsequently commented that it witnessed

> a disturbing number of cases involving intolerable delay in post-trial processing of courts-martial which [arose] since this Court in *United States v. Banks*, 7 MJ 92 (CMA 1979), withdrew from the "inflexible application" (*id.* at 93) of the presumption of prejudice from such a delay ...

*United States v. Shely*, 16 MJ 431 (CMA 1983). I hope that the majority of this Court, after 20 years' experience in charted waters of effective application of the *Burton* standard, is prepared to be vigilant against a similar recurrence of intolerable pretrial delay in the sea of uncertainty upon which it today embarks.

The more things change, the more they stay the same.