**UNITED STATES**

v.

**Shane A. MORGAN, Mess Management Specialist Seaman Recruit (E–1), U.S. Navy.**

**NMCCA 200401114.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 9 April 2003.

Decided 10 April 2007.

LT Jennie L. Goldsmith, JAGC, USN, Appellate Defense Counsel.

LT Christopher Burris, JAGC, USNR, Appellate Government Counsel.

Maj Kevin Harris, USMC, Appellate Government Counsel.

Before RITTER, Senior Judge, FELTHAM, and WHITE, Appellate Military Judges.

FELTHAM, Judge:

A general court-martial, composed of officer and enlisted members, convicted the appellant, contrary to his pleas, of unauthorized absence, making a false official statement, and misprision of a serious offense, in violation of Articles 86, 107, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 907, and 934. The appellant was sentenced to a dishonorable discharge, forfeiture of all pay and allowances, and confinement for 42 months. The convening authority approved the sentence as adjudged.

The appellant raises five assignments of error: (1) his conviction for making a false official statement was factually and legally insufficient because his statement to civilian law enforcement authorities was not made in the line of duty; (2) he was denied a speedy trial pursuant to Article 10, UCMJ, 10 U.S.C.

§ 810, when he was held in pretrial confinement for 110 days; (3) the false official statement and misprision of a serious offense charges were multiplicious; (4) the false official statement and misprision of a serious offense charges constitute an unreasonable multiplication of charges; and (5) the adjudged punishment was inappropriately severe.

We have carefully considered the record of trial, the appellant's assignments of error, and the Government's response. Following our corrective action, we conclude that the remaining findings and the sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant remains. *See* Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

### Facts

On 6 August 2002, the body of a 26–year–old male, Paul Sean Wright, was found in a public park in Hyattsville, Maryland. An autopsy concluded that Mr. Wright died of four gunshot wounds, one each to the left side of the head, the front of the chest, the right hip, and the back of the right thigh.

During an investigation by the Prince George's County (Maryland) Police Department, members of Mr. Wright's family told homicide detectives that the appellant was the last person known to have been with Mr. Wright before his death. They gave the detectives a photograph of the appellant in his Navy uniform.

The detectives learned that the appellant was staying at his mother's address in the Hyattsville area while on leave from his ship, USS KLAKRING (FFG 42), and, on 8 August 2006, went there to interview him. The appellant agreed to accompany the detectives to the Prince George's County Criminal Investigation Division offices in Landover, Maryland.

At the police station, the appellant provided two written statements. In his first statement, Prosecution Exhibit 2, the appellant wrote that he was in the Navy, that he had known Mr. Wright since age six, that they were childhood friends from Jamaica, and that he had given Mr. Wright a ride the evening before Mr. Wright's body was dis-

covered. In the statement, the appellant said he was driving a Lincoln Navigator that belonged to a fellow Sailor. The statement explained that, by prior arrangement, the Navigator's owner had allowed the appellant to drive it in exchange for the appellant's agreeing to change the oil in the vehicle, and allowing the fellow Sailor to use the appellant's car.

In this initial statement, the appellant claimed he dropped Mr. Wright off at a bus stop, and that Mr. Wright rode away in a taxi. The appellant wrote that this was the last time he saw Mr. Wright alive, and that he learned about his murder two days later when the victim's cousin called him with the news. He wrote that he did not know who killed Mr. Wright, and that no one else had been in the Navigator with him and Mr. Wright. When asked if he suspected anyone of involvement in the murder, he wrote that the victim had been a member of a Jamaican gang called "Shooters Crew" and that the gang was involved in a then-ongoing war with rival gangs. At the end of his statement, the appellant wrote that he wished to make no corrections or additions to it. The statement was dated 8 August 2002 at 1453 hours.

Because they believed the appellant's answers to some of their questions were inconsistent, the police officers continued to interview him after he signed his first statement. As a result of these interviews, he later provided a second written statement. In the second statement, dated 8 August 2002 at 1810 hours, the appellant wrote that he picked up Mr. Wright in the Lincoln Navigator at around 2230 hours on the evening before Mr. Wright's body was discovered. He wrote that Mr. Wright claimed to have had a portfolio containing a quarter-pound of marijuana in his possession, and that he told the appellant to pick up three of the appellant's friends so they could smoke the marijuana together.

The appellant wrote that he then picked up three individuals he identified as Drew, Ranado, and "Bad."[1] He wrote that "Bad" began arguing with Mr. Wright over an allegation that Mr. Wright had either tried to rape "Bad's" girlfriend, or made sexual advances toward her, and that Ranado and Drew joined the argument. The statement claimed that Ranado and "Bad" brandished firearms, and told the appellant to drive to a park. The appellant wrote that, when they arrived at the park, Ranado and "Bad" ordered Mr. Wright out of the truck and shot him to death as he tried to run away. Ranado and "Bad" took Mr. Wright's keys, cell phone, pager, and the portfolio containing the marijuana. They then told the appellant to drive them to another location, where they burned the portfolio, and disposed of the phone, the pager, and the keys.

On the basis of his second statement, the appellant was charged with murder and detained by Prince George's County authorities for 60 days. He was released on 8 October 2002, and returned to his command. His unauthorized absence began on 18 November 2002. It ended on 18 December 2002, when he was apprehended by Naval Criminal Investigative Service (NCIS) agents at his mother's residence in Hyattsville, Maryland.

### Legal and Factual Sufficiency

In his first assignment of error, the appellant claims his conviction for making a false official statement was legally and factually insufficient because his first written statement to civilian law enforcement officers was not made in the line of duty. We agree.

The test for legal sufficiency is whether, considering the evidence in the light most favorable to the Government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987); *United States v. Reed*, 51 M.J. 559, 561–62 (N.M.Crim.Ct.App.1999), *aff'd*, 54

---

1. The appellant testified that he made up the name "Drew," and that this individual does not exist. Record at 329. "Bad" is a so-called street name or nickname. The murder victim, Mr. Paul Wright, was known to the appellant by the street names "Tax" and "Kevin Pusey." The appellant told a homicide detective that his own street names were "LaRose" and "Drive-by." *Id.* at 499.

M.J. 37 (C.A.A.F.2000); *see also* Art. 66(c), UCMJ.

The test for factual sufficiency is whether, after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses, as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt. *Turner,* 25 M.J. at 325; *see also* Art. 66(c), UCMJ.

Reasonable doubt does not require that the evidence presented be free from conflict. *United States v. Lips,* 22 M.J. 679, 684 (A.F.C.M.R.1986). Further, this court may believe one part of a witness' testimony and disbelieve other aspects of his or her testimony. *United States v. Harris,* 8 M.J. 52, 59 (C.M.A.1979).

Conviction of making a false official statement requires proof beyond a reasonable doubt:

(1) That the accused signed a certain official document or made a certain official statement;

(2) That the document or statement was false in certain particulars;

(3) That the accused knew it to be false at the time of signing it or making it; and

(4) That the false document or statement was made with the intent to deceive.

MANUAL FOR COURTS-MARTIAL, UNITED STATES (2002 ed.), Part IV, ¶ 31b.

"Official documents and official statements include all documents and statements made in the line of duty." *Id.* at ¶ 31c(1). We find that the appellant's first written statement to Prince George's County homicide detectives on 8 August 2002 was not "official" for purposes of Article 107, UCMJ.

The term "official" is not defined in the Uniform Code of Military Justice or the Manual for Courts–Martial so as to readily address the facts presented by this case. The text of the UCMJ provides that: "Any person subject to this chapter who, with intent to deceive, signs any false record, return, regulation, order, or other official document, knowing it to be false, or makes any other false official statement knowing it to be false, shall be punished as a court-martial may direct." Art. 107, UCMJ. The Manual indicates that the term "official statements" includes all "statements made in the line of duty," but does not define "line of duty." *Id.* at ¶ 31c(1).

The question of whether a false statement to civilian law enforcement authorities may be "official" for purposes of Article 107, UCMJ, was addressed by our superior court in *United States v. Teffeau,* 58 M.J. 62 (C.A.A.F.2003). The appellant in that case was a Marine Corps recruiter assigned to a recruiting substation in Wichita, Kansas. His duties included making weekly contact with recruits waiting to enter active duty under the Delayed Entry Program (DEP). While on duty, Staff Sergeant (SSgt) Teffeau notified his supervisor that he and another recruiter were driving to a nearby town. He and the other recruiter then drove a Government-owned vehicle to the house of a female DEP recruit for the purpose of celebrating another female recruit's departure for boot camp. Both were in uniform.

After they arrived, SSgt Teffeau and the other recruiter spent nearly three hours drinking beer and hard liquor with the female recruit. They then changed out of their uniforms, and drove to a nearby lake with the recruit. SSgt Teffeau drove the Government vehicle, following the other recruiter and the recruit, who rode in the recruit's car. As she drove back from the lake, the recruit's car skidded into a tree, killing her and injuring the other recruiter. SSgt Teffeau was in the Government vehicle and was not injured.

Local civilian police officers investigating the accident interviewed SSgt Teffeau. He was in uniform when interviewed, and was accompanied to the police station by a military supervisor for his initial interview. The civilian police were aware of his military status and duties. SSgt Teffeau made three false statements to the police while being interviewed.

At trial, SSgt Teffeau was found guilty of three specifications charging him with making false official statements, in violation of Article 107, UCMJ. Before entering pleas, he moved to dismiss these specifications for failure to state an offense. The military judge denied his motion, and he was subsequently

found guilty of all three specifications by a panel of members. Our court affirmed the conviction.

In a unanimous decision, our superior court affirmed, holding that SSgt Teffeau's statements to civilian police officers were "official" for purposes of Article 107, UCMJ. *Teffeau*, 58 M.J. at 69. It noted that it "has recognized that the scope of Article 107 is more expansive than its civilian counterpart, 18 U.S.C. § 1001 (2002), because 'the primary purpose of military criminal law—to maintain morale, good order, and discipline—has no parallel in civilian criminal law.' " *Id.* at 68–69 (quoting *United States v. Solis*, 46 M.J. 31, 34 (C.A.A.F.1997)). The court then found that the "entire incident and investigation bore a direct relationship to [SSgt Teffeau's] duties and status as a Marine Corps recruiter." *Id.* at 69. It cited numerous facts that showed the nexus between the subject of the civilian police investigation and SSgt Teffeau's military duties, and noted that: "Unquestionably, the entire sequence of events had its origin in Appellant's duties, responsibilities, and status as a recruiter." *Id.*

Rejecting "any absolute rule that statements to civilian law enforcement officers can never be official within the meaning of Article 107," the court held: "[t]he circumstances leading up to and surrounding the statements made to the [civilian] police bear a clear and direct relationship to Appellant's duties as a recruiter and reflect a substantial military interest in the investigation. The statements Appellant made to the [civilian] police were therefore 'official' within the meaning of Article 107." *Id.*

Unlike *Teffeau*, the "circumstances leading up to and surrounding" the appellant's first written statement to civilian police did not "bear a clear and direct relationship" to his military duties, and did not "reflect a substantial military interest" in the civilian police investigation. *See Teffeau*, 58 M.J. at 69. The appellant was on leave, visiting his mother in Maryland, when the Prince George's County police first contacted him. He was several hundred miles away from his place of duty, and the sequence of events leading up to his initial contact with the civilian police

had no relation to his "duties, responsibilities, and status" as a Sailor. He was not in uniform when interviewed, and was not accompanied to the police station by an official command representative.

Although the Prince George's County police knew the appellant was an active duty member of the U.S. Navy, their official interest in him had nothing to do with his military status. Their investigation concerned a murder committed in violation of Maryland state law, and was limited to enforcing the laws of that jurisdiction. They were not acting on behalf of the armed forces, and the Navy had no official interest in their investigation. The appellant's false written statement to them predated, by several months, the events that led to his conviction for absence without leave. Although the appellant's first statement to the civilian police was known by him to be false at the time he signed it, and was clearly made with the intent to deceive, we hold that it was not "official" within the meaning of Article 107, UCMJ. *See, e.g., United States v. Johnson*, 39 M.J. 1033 (A.C.M.R.1994). We will disapprove the finding of guilty of this offense (Charge IV).

Under the circumstances of this case, we decline to affirm findings of guilty of making a false official statement to civilian police officers as a violation of clauses 1 or 2 of Article 134, UCMJ. First, the language of clauses 1 and 2 was not incorporated in the specification charging the appellant with making a false official statement. Second, the military judge did not instruct the court members on lesser included offenses of the offense of false official statement, telling them instead that "it's either not guilty or guilty." Record at 652. Therefore, the members did not find that the appellant's false statement was prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces.

In his third and fourth assignments of error, the appellant contends that the false official statement charge was multiplicious, or an unreasonable multiplication of charges, with the charge of misprision of a serious offense. In view of our decision to set aside the finding of guilty of making a false official

statement, these assignments of error are moot.

## Speedy Trial

The appellant claims on appeal, and asserted at trial, that he was denied a speedy trial, as guaranteed by Article 10, UCMJ, when he was held in pretrial confinement for 110 days, despite having made three requests for a speedy trial.

When reviewing the question of whether an appellant received a speedy trial under Article 10, UCMJ, we apply a *de novo* standard of review. *United States v. Cooper*, 58 M.J. 54, 57–58 (C.A.A.F.2003). When a military judge has made findings of fact in ruling on a motion to dismiss for denial of a speedy trial, we review those findings for clear error. If we find no clear error, those findings can be accorded substantial deference and adopted by this court. *Id.* at 58. We have reviewed the military judge's extensive findings of fact and, finding no clear error, adopt them as our own.

The standard of diligence under which we review a claim of denial of speedy trial under Article 10, UCMJ, "is not constant motion, but reasonable diligence in bringing the charges to trial." *United States v. Tibbs*, 35 C.M.R. 322, 325, 1965 WL 4672 (C.M.A.1965); *see United States v. Kossman*, 38 M.J. 258, 262 (C.M.A.1993). Short periods of inactivity are not fatal to an otherwise active prosecution. *Tibbs*, 35 C.M.R. at 325. Further, we are mindful that the four factors used to determine whether a Sixth Amendment speedy trial violation has occurred are an apt structure for examining the facts and circumstances surrounding an alleged Article 10, UCMJ, violation. *Cooper*, 58 M.J. at 61; *see United States v. Birge*, 52 M.J. 209, 212 (C.A.A.F.1999)(citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). Those four factors are: (1) length of the delay; (2) reasons for the delay; (3) assertion of the right to a speedy trial; and (4) prejudice. *Id.* at 212 (citing *Barker*, 407 U.S. at 530, 92 S.Ct. 2182).

In reviewing the question of whether the appellant was denied his right to a speedy trial, we have examined not only the period of time from his apprehension on 18 December 2002 to the date of arraignment, but have also examined the period from 8 August 2002, when the appellant was first interviewed by civilian police and arrested, until his apprehension for unauthorized absence. This earlier period includes his release by civilian authorities on 8 October 2002, his return to his command, the commencement of his unauthorized absence on 18 November 2002, and ends with his apprehension on 18 December 2002.

In applying a *de novo* standard of review to the appellant's case, we are mindful of the requirements of Article 10, UCMJ, as well as the four *Barker* factors. Applying all of the aforementioned standards of review and factors to the record before us, we agree with the military judge and find that the appellant was not denied his right to a speedy trial under Article 10, UCMJ.

## Sentence Severity

In his fifth assignment of error, the appellant claims his sentence is inappropriately severe. We disagree and find that the sentence is appropriate to the offender and his offenses. *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A.1988); *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A.1982).

Because of our decision to set aside the findings of guilty of Charge IV (False Official Statement), we have reassessed the sentence in accordance with the principles of *United States v. Moffeit*, 63 M.J. 40 (C.A.A.F.2006); *United States v. Cook*, 48 M.J. 434 (C.A.A.F. 1998); *United States v. Peoples*, 29 M.J. 426, 428 (C.M.A.1990); and *United States v. Sales*, 22 M.J. 305, 307–08 (C.M.A.1986). We find that the sentence received by the appellant would not have been lighter had the members not found him guilty of making a false official statement. In reassessing the sentence, we have carefully considered the record of trial, the evidence pertaining to the remaining findings of guilty, and the military judge's instruction to the members that they were to consider the false official statement and misprision of a serious offense charges multiplicious for sentencing. We have also carefully considered all the evidence presented in aggravation, as well as extenuation and mitigation, of the offenses of which the appellant now stands guilty.

## Conclusion

The findings of guilty of Charge IV and its specification are set aside and Charge IV and its specification are dismissed. Accordingly, we affirm the remaining findings of guilty and the sentence, as approved by the convening authority.

Senior Judge RITTER and Judge WHITE concur.