UNITED STATES, Appellee

v.

James H. FINCH, Staff Sergeant
U.S. Marine Corps, Appellant

No. 05-0453

Crim. App. No. 200000056

United States Court of Appeals for the Armed Forces

Argued March 21, 2006

Decided September 29, 2006

CRAWFORD, J., delivered the opinion of the Court, in which
EFFRON and BAKER, JJ., joined. GIERKE, C.J., filed a separate
opinion concurring in part and dissenting in part. ERDMANN, J.,
filed a separate opinion concurring in part and dissenting in
part.

Counsel

For Appellant: Lieutenant Brian L. Mizer, JAGC, USNR (argued).

For Appellee: Lieutenant Craig A. Poulson (argued); Commander
Charles N. Purnell, JAGC, USN (on brief); Lieutenant Kathleen A.
Helmann, JAGC, USNR.

For Amicus Curiae: Candice Cleere (law student) (argued);
Michael F. Noone Jr., Esq. (supervising attorney) and Lieutenant
Rachel Mangas, JAGC, USN (law student) (on brief) – The Catholic
University of America, Columbus School of Law, Military and
National Security Law Students Association.

Military Judge: S. F. Day

**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Judge CRAWFORD delivered the opinion of the Court.

Contrary to his pleas, Appellant was convicted by a military judge sitting as a general court-martial of conspiracy to violate a general order, failure to obey a lawful general order, failure to obey a lawful order, making a false official statement, and being drunk on duty, in violation of Articles 81, 92, 107, and 112, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 892, 907, 912 (2000). Appellant was found not guilty of involuntary manslaughter arising from the same circumstances. Appellant was sentenced to confinement for five months, reduction to pay grade E-1, and a bad-conduct discharge. The convening authority approved the sentence as adjudged and, except for the bad-conduct discharge, ordered it executed. The United States Navy-Marine Corps Court of Criminal Appeals affirmed the findings and sentence.

### STATEMENT OF THE ISSUES

On November 14, 2005, this Court granted review of the following issues:

I.   WHETHER APPELLANT WAS DENIED THE OPPORTUNITY TO DEFEND HIMSELF AGAINST CHARGE I WHERE THE MILITARY JUDGE'S FINDINGS OF GUILTY BY EXCEPTIONS AND SUBSTITUTIONS RESULTED IN A MATERIAL VARIANCE.

II.  WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE FAILED TO SUPPRESS APPELLANT'S STATEMENT IN ACCORDANCE WITH THIS COURT'S RULING IN UNITED STATES V.

McOMBER, 1 M.J. 380 (C.M.A. 1976), AND THE FIFTH
AMENDMENT TO THE UNITED STATES CONSTITUTION.

III. WHETHER APPELLANT HAS BEEN DENIED HIS DUE PROCESS
RIGHT TO TIMELY REVIEW OF HIS APPEAL.[1]

STATEMENT OF FACTS

At the time of the offenses, both Appellant and Staff Sergeant (SSgt) Charles D. Teffeau, Jr. were recruiters in the United States Marine Corps assigned to the recruiting substation in Wichita, Kansas. JT and JK were recruits awaiting entry through the delayed entry program. Appellant originally tried to recruit JK when she was in high school. After failing the Armed Services Vocational Aptitude Test, JK enrolled in Coffeyville Community College, which was outside Appellant's recruiting district. JK was eventually able to pass the aptitude test and enrolled in the Marine Corps through SSgt Raymond Sutton, the local recruiter in Coffeyville. Although JK had not enlisted in his recruiting district, Appellant maintained communications with her. SSgt Sutton complained about the communication between Appellant and JK and Appellant was ordered to have no further contact with her.

The incidents in this case occurred on January 3, 1997. Appellant and SSgt Teffeau had worked part of the day

---

[1] We heard oral argument in this case at The Catholic University of America, Columbus School of Law, Washington, D.C., as part of the Court's "Project Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003).

interviewing potential recruits in Arkansas City. The two recruiters had a government vehicle and were planning to meet JT and JK at JT's residence to celebrate JK's acceptance to boot camp. JK was scheduled to ship to boot camp on January 6, 1997. Before meeting the two recruits, Appellant and SSgt Teffeau stopped at a gas station and purchased a case of beer, which they put into the trunk of the government vehicle. They then proceeded to JT's residence.

While at JT's residence, Appellant and SSgt Teffeau consumed an unspecified quantity of bourbon and Coke.[2] JK consumed an unspecified amount of schnapps. JT did not consume alcohol because she had to work later that day. After approximately three hours, JT had to go to work and asked her companions to leave. Appellant, SSgt Teffeau, and JK decided to go to Winfield Lake. As her friends left, JT overheard Appellant tell SSgt Teffeau, "Grab the beer and let's go. . ." Appellant and JK rode in JK's Ford Mustang to the lake, while SSgt Teffeau followed in the government vehicle.

When they arrived at Winfield Lake, Appellant and JK each consumed at least one of the beers. They did not stay long at

---

[2] JT testified that Appellant and SSgt Teffeau consumed bourbon mixed with Coke and JK consumed schnapps at JT's residence. SSgt Teffeau testified that he did not consume any alcohol at JT's residence. The court below held that Appellant and SSgt Teffeau did consume the bourbon.

Winfield Lake (five minutes according to SSgt Teffeau).

Appellant and JK left in her Mustang while SSgt Teffeau drove

the government vehicle.  As they departed the lake area, JK's

car slid off the road, struck a tree, and went into Winfield

Lake.  JK was killed in the accident and Appellant suffered

cracked ribs, a concussion, lacerations, and abrasions.  JK's

blood-alcohol content (BAC) was .07 grams of alcohol per 100

milliliters of blood.  Appellant's BAC was .15 grams per 100

milliliters of blood.

Issue I

Facts Specific to Issue I

Appellant was arraigned under the following charge:

Charge I, violation of the UCMJ, Article 81 and the single specification: In that Staff Sergeant James H. Finch on active duty did at or near Winfield, Kansas on or about 3 January 1997 conspire with Staff Sergeant Charles E. Teffeau, Jr., U.S. Marine Corps, to commit an offense under the Uniform Code of Military Justice to wit: Providing alcohol for consumption to a person enrolled into the delayed-entry program in violation of a general order to wit: Marine Corps Recruit Depot, San Diego order 1100.4(alpha), paragraph 6(d) dated 21 May 1992; and in order to effect the object of the conspiracy Staff Sergeant Finch planned with Staff Sergeant Teffeau to meet and consume alcohol with [JK] and [JT], persons enrolled in the delayed-entry program.  And Staff Sergeant Finch and Staff Sergeant Teffeau purchased Bud Light beer at the Phillips 66 service station in Winfield, Kansas, and transported that beer to the [T] residence.

When announcing his findings, the military judge excepted the

words, "Staff Sergeant Finch planned with Staff Sergeant Teffeau

to meet and consume alcohol with [JK] and [JT], persons enrolled

5

in the delayed-entry program" and "Staff Sergeant Finch and

Staff Sergeant Teffeau purchased Bud Light Beer at the Phillips

66 Service Station in Winfield, Kansas, and transported that

beer to the [T] residence."  He substituted these words:

> Staff Sergeant Finch and Staff Sergeant Teffeau
> agreed to accompany [JK], a person enrolled in the
> delayed-entry program, to the Winfield City Lake for
> the purpose of talking and consuming Bud Light Beer
> that Staff Sergeant Finch had recently purchased at
> the Phillips 66 service station in Winfield, Kansas,
> and Staff Sergeant Finch, Staff Sergeant Teffeau, and
> [JK] did thereafter drive in two separate vehicles to
> the Winfield City Lake where Staff Sergeant Finch and
> [JK] did consume some of the aforesaid Bud Light Beer.

Discussion

Appellant's trial defense counsel did not object to the

exceptions and substitutions at trial.  Failure to object at

trial constitutes waiver of that issue.[3]  When an objection is

waived at trial, it can only be reviewed by establishing plain

error.  In United States v. Powell, 49 M.J. 460, 463-64

(C.A.A.F. 1998), this Court set forth the three elements for the

plain error test:  (1) that there was an error; (2) that the

error was plain, that is, clear or, equivalently, obvious; and

(3) the plain error affected substantial rights.  49 M.J. at

463.  In this case, we hold that there was no clear error on the

---

[3] R.C.M. 905(e).

part of the military judge.  In doing so, we utilize this Court's material variance test in our plain error analysis.[4]

"To prevail on a fatal-variance claim, appellant must show that the variance was material and that it substantially prejudiced him."  United States v. Hunt, 37 M.J. 344, 347 (C.M.A. 1993).  A variance that is "material" is one that, for instance, substantially changes the nature of the offense, increases the seriousness of the offense, or increases the punishment of the offense.  See United States v. Teffeau, 58 M.J. 62, 66 (C.A.A.F. 2003); Rules for Courts-Martial (R.C.M.) 918(a)(1).  When applying this two-part test, this Court has placed an increased emphasis on the prejudice prong, noting that "Even where there is a variance in fact, the critical question is one of prejudice."  United States v. Lee, 1 M.J. 15, 16 (C.M.A. 1975) (citing United States v. Craig, 8 C.M.A. 218, 24 C.M.R. 28 (1957); United States v. Hopf, 1 C.M.A. 584, 5 C.M.R. 12 (1952)).  In Lee, this Court goes further and broke down the prejudice prong into a two-part analysis:  "(1) has the accused been misled to the extent that he has been unable adequately to prepare for trial; and (2) is

---

[4] Although I apply this Court's plain error analysis in this case, I would employ the Supreme Court's plain error analysis from Johnson v. United States, 520 U.S. 461 (1997).  See United States v. Cary, 62 M.J. 277, 279 (C.A.A.F. 2006) (Crawford, J., concurring in result); United States v. Kho, 54 M.J. 63, 65 (C.A.A.F. 2000) (Crawford, C.J., concurring in result).

the accused fully protected against another prosecution for the same offense."  Id.

In the present case, the variance is not material.  The charged offense here is violating Article 81, UCMJ, on January 3, 1997, by conspiring to violate a general order by providing alcohol for consumption to a person enrolled in the delayed entry program.  The military judge's exceptions and substitutions did not substantially change the nature of the offense.  The primary difference between the charged offense and the offense of which the military judge found Appellant guilty went to the acts taken in furtherance of that conspiracy -- specifically, in the location of the consumption of the alcohol that was provided and the exact manner by which it was provided.  This Court has held that "minor variances, such as the location of the offense or the date upon which an offense is allegedly committed, do not necessarily change the nature of the offense and in turn are not necessarily fatal."  Teffeau, 58 M.J. at 66.  Compare United States v. Wray, 17 M.J. 375, 376 (C.M.A. 1984) (holding that changing the date and amount of the larceny under the circumstances of that case changed the identity of the offense).

In light of the ongoing socializing on the fatal day, any of a host of acts might have been cited as an act in furtherance of the agreement between Appellant and SSGT Teffeau to provide

8

alcohol to these young women for their consumption.  Although an overt act is an element of the offense of conspiracy, see Article 81, UCMJ; Manual for Courts-Martial, United States pt. IV, para. 5.b. (2005 ed.) (MCM), it is not the core of the offense.  Rather, its purpose as an element is to demonstrate that the agreement to commit a crime -- which is the inherent nature of the offense of conspiracy -- is alive and in motion.  See United States v. Collier, 14 M.J. 377, 380 (C.M.A. 1983).  Under the circumstances of this case, a variance between the pleadings and findings as to any or all of those acts did not substantially change the nature or seriousness of the offense or increase the punishment to which Appellant was subject.

Location usually is not a substantial part of the offense of conspiracy.  To be found guilty of conspiracy, only two things need to be found:  (1) the accused entered into an agreement with another to commit an offense, and (2) the accused acts to effect the object of the conspiracy.  Article 81, UCMJ.  In the present case, the object of the conspiracy was agreed to provide alcohol to a person admitted to the delayed entry program in violation of a general order.  To find a material variance, the elements proven must be substantially different from those charged.  See R.C.M. 918(a)(1).

Unlike Appellant's assertion, there were not two criminal conspiracies in this case.  Conspiracy is a continuing offense.

MCM pt. IV, para. 5.c.  Specifying JT's house as the location of the alcohol consumption was not an essential part of the conspiracy.  Substituting the lake as the location of the alcohol consumption likewise was unnecessary.  All that needed to be charged was the fact that Appellant and SSgt Teffeau agreed to provide alcohol to a person enrolled in the delayed entry program in violation of a general order.  Without the details of the specific location, Appellant is still guilty of the offense charged.  The quantity and location of the alcohol consumption was at issue throughout this case, indicating that Appellant was on notice that both issues would be litigated.  Therefore the variance between the offense charged and the offense of which the military judge found Appellant guilty was not material.

Under the circumstances of this case, the change in the description of the alleged acts taken in furtherance of that conspiracy did not prejudice Appellant -- that is, it neither misled Appellant in preparing or presenting his defense, nor failed to protect him against a subsequent prosecution for the same misconduct.  First, Appellant has not shown that he was unable to prepare adequately for trial.  Significantly, Appellant did not object to the military judge's findings at the time they were announced.  In addition, the defense did not ask the military judge to make special findings as to the conspiracy

10

offense.[5]  See R.C.M. 918(b).[6]  The conduct of the four

participants that day was fully revealed by evidence presented

by the Government and the defense and was subject to cross-

examination and further amplification by the opposing party.

The central nature of the offense was whether Appellant

conspired with another to provide alcohol to delayed entry

trainees.  The location where Appellant was to accomplish the

intended offense is not essential to the existence of a

conspiracy.  Indeed, there is no requirement that the offense,

which is the object of the conspiracy, be committed.  The

offense was complete when Appellant or his coconspirator

performed some overt act to bring about the object of the

conspiracy.

Second, the facts were presented at trial on the conspiracy

offense.  The judge found Appellant guilty of conspiracy based

on those facts.  Thus, Appellant cannot be tried again for the

same offense.  See R.C.M. 907(b)(2)(C).  Appellant has not

explained on appeal how, if at all, this preparation or

presentation of his defense was affected.  In addition,

---

[5] Appellant also did not raise a variance issue regarding the judge's findings in his post-trial submission to the convening authority.

[6] R.C.M. 918(b) provides that any party may request special findings as "to matters of fact reasonably in issue as to an offense and need be made only as to offenses of which the accused was found guilty."

Appellant has not established any prejudice by demonstrating that he was misled as to (1) what he had to defend against at trial, or (2) whether he could be tried again for the same offense or a similar one. The variance was not material. Even assuming there was an error, Appellant has failed to show prejudice stemming from that error. Therefore, we hold that there is no plain error in this case based on a claim of material variance.

Issue II

Facts specific to Issue II

When Appellant was interviewed by the military investigator, he unquestionably was represented by civilian counsel for the incident that forms the basis of the charges in this case. Appellant's civilian counsel had been in contact with the civilian investigators regarding Appellant's case and instructed them that any contact with Appellant should be coordinated through him. On March 12, 1997, Appellant was interviewed by a military investigator, Captain (CPT) Montgomery.[7] Detective Shaw, a civilian investigator, told CPT Montgomery that Appellant had retained a "hot shot lawyer." CPT Montgomery was on notice that Appellant had counsel. During the

---

[7] This was the second of three meetings between Appellant and military investigators. The first meeting occurred on March, 5 1997 with Major Bettendorf. The final meeting, also with CPT Montgomery, occurred on March 24, 1997. The final meeting was terminated once Appellant unequivocally requested counsel.

interview with CPT Montgomery, Appellant signed a waiver of his
Article 31, UCMJ, 10 U.S.C. § 831 (2000), rights and
subsequently made a number of statements that became the subject
of a defense motion to suppress.  The military judge denied the
motion and admitted Appellant's statements to CPT Montgomery at
trial.  Appellant now claims this was a violation of his rights
to have counsel notified and given an opportunity to be present
during the interview.  This requirement was derived from United
States v. McOmber, 1 M.J. 380 (C.M.A. 1976).

Discussion

The legal question raised by Appellant in this case is
whether the notice to counsel requirement under the McOmber rule
is still valid.  In McOmber, this Court ruled:

> If the right to counsel is to retain any vitality, the
> focus in testing for prejudice must be readjusted
> where an investigator questions an accused known to be
> represented by counsel.  We therefore hold that once
> an investigator is on notice that an attorney has
> undertaken to represent an individual in a military
> criminal investigation, further questioning of the
> accused without affording counsel reasonable
> opportunity to be present renders any statement
> obtained involuntary under Article 31(d) of the
> Uniform Code.

1 M.J. at 383.

McOmber sought to fulfill the statutory purpose of Article
27, UCMJ, regarding the right to counsel in a manner consistent
with parallel developments in the Supreme Court's constitutional

13

analysis of the right to counsel (e.g., the constitutional "overtones" discussed in the McOmber opinion regarding the right to counsel in the context of interrogations).  The McOmber rule, which was codified in the Military Rules of Evidence and titled "Notice to Counsel," read:

> When a person subject to the code who is required to give warnings under subdivision (c) intends to question an accused or person suspected of an offense and knows or reasonably should know that counsel either has been appointed for or retained by the accused or suspect with respect to that offense, the counsel must be notified of the intended interrogation and given a reasonable time in which to attend before the interrogation may proceed.

Military Rule of Evidence (M.R.E.) 305(e) (1994).  The analysis of the rules states explicitly, "Rule 305(e) is taken from United States v. McOmber."  Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-15 (1994 ed.).  Essentially, the McOmber rule and the old M.R.E. 305(e) required an investigator to notify an accused's attorney that the accused is about to be interrogated and then to give the attorney a reasonable opportunity to be present at the interrogation.

In United States v. LeMasters, 39 M.J. 490, 492 (C.M.A. 1994) this Court ruled that the notification requirement could be waived if the suspect or accused initiates the discussion with authorities and is made aware of his right to have his counsel notified and present.

14

Shortly after the decision in LeMasters, the Military Rules of Evidence were amended. The new (and current) version of M.R.E. 305(e)[8] was renamed "Presence of Counsel" and provides for two situations where counsel must be present, absent waiver: (1) custodial interrogations and (2) post-preferral interrogation. These changes were instituted to conform the Military Rules of Evidence to the Supreme Court's decisions in Minnick v. Mississippi, 498 U.S. 146 (1990),[9] and McNeil v. Wisconsin, 501 U.S. 171 (1991).[10] Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app.

---

[8] M.R.E. 305(e) states:

> Presence of counsel. (1) Custodial interrogation. Absent a valid waiver of counsel under subdivision (g)(2)(B), when an accused or person suspected of an offense is subjected to custodial interrogation under circumstances described under subdivision (d)(1)(A) of this rule, and the accused or suspect requests counsel, counsel must be present before any subsequent custodial interrogation may proceed.
> (2) Post-preferral interrogation. Absent a valid waiver of counsel under subdivision (g)(2)(C), when an accused or person suspected of an offense is subjected to interrogation under circumstances described in subdivision (d)(1)(B) of this rule, and the accused or suspect either requests counsel or has an appointed or retained counsel, counsel must be present before any subsequent interrogation concerning that offense may proceed.

[9] The Court in Minnick held that once a suspect has requested counsel, interrogators may not reinitiate questioning unless the attorney is present, regardless of whether or not there has been an outside consultation. 498 U.S. at 153.
[10] The Court in McNeil states that the Sixth Amendment right to counsel applies "at the first formal proceeding against an accused." 501 U.S. at 181.

22 at A22-15 through A22-16 (2005 ed.).  Absent in the revised

rule is the notice requirement originally created in McOmber:

> Subdivision (e)(2) supersedes the prior notice to
> counsel rule.  The prior rule, based on United States
> v. McOmber . . . is not consistent with Minnick and
> McNeil. . . . Minnick and McNeil reexamine the Fifth
> and Sixth Amendment decisions central to the McOmber
> decision; the amendments to subdivision (e) are the
> result of that reexamination.

Id. at 16.  We cannot rely solely on the President's change to

M.R.E. 305(e) to overrule McOmber.  McOmber was a statutorily

based decision and the underlying statute has not changed.  A

change in a rule cannot supplant a statute, including a

statutorily based judicial decision.  See United States v.

Kossman, 38 M.J. 258, 260-61 (C.M.A. 1993) (stating that the

President cannot overrule or diminish an act of Congress or the

Court of Appeals for the Armed Forces' interpretation of the

statute).  However, McOmber represented an attempt to ensure

that the statutory right to counsel under Article 27, UCMJ, was

administered in a manner consistent with then-current Supreme

Court constitutional precedent regarding the right to counsel.

Minnick and McNeil subsequently modified that precedent.  In the

absence of a distinct military rationale justifying its

continued application in light of these changes, McOmber is

overruled.  M.R.E. 305(e) remains controlling authority.

Applying M.R.E. 305(e) to the facts of this case, the

military judge did not err in admitting Appellant's pretrial

statement to CPT Montgomery.  Appellant was advised of his Article 31(b), UCMJ, rights and signed a valid, written waiver of his rights in accordance with M.R.E. 301(g).  One of the rights Appellant acknowledged and waived, as indicated by his initials, reads, "I expressly do not desire to consult with either a civilian lawyer retained by me or a military lawyer appointed as my counsel without cost to me prior to questioning."

Appellant also acknowledged waiver of these rights when questioned by the military judge at trial regarding the written waiver.[11]  Furthermore, Appellant acknowledged that his civilian attorney told him not to go into questioning without him and Appellant intentionally ignored that advice.  Based on Appellant's own testimony and actions in reviewing and signing the Article 31, UCMJ, rights form at the time of the

---

[11]
```
MJ:    And it says here you don't desire to talk to
       the civilian lawyer, and you had a civilian
       lawyer, Mr. Moses, right?

App:   Yes, sir.

MJ:    Or a military lawyer?

App:   Yes, sir.

.  .  .  .

MJ:    As you were going over this form with him in that
       room that he described, did you say, "Get me a
       military lawyer"?

App:   No, sir, I didn't.
```

interrogation, Appellant waived any right he may have had to have his counsel notified of and be present at the interrogation.  See LeMasters, 39 M.J. at 493 (holding that notice to counsel may be waived).

The current version of M.R.E. 305(e) does not require an investigator to notify an accused's or suspect's counsel prior to initiating an interview, regardless of whether the investigator knows or reasonably should know that the accused or suspect is represented by counsel on the offenses about which the investigator intends to question him.  The McOmber notification rule and the subsequent codification of the rule in the Military Rules of Evidence were not constitutionally required under the Fifth or Sixth Amendments of the Constitution and are not consistent with the law set forth in Minnick and McNeil.[12]  Thus, there is no constitutional requirement to provide an accused with more rights than those set out in the rules.  Accordingly, we hold that the military judge did not err in admitting Appellant's statement to CPT Montgomery.

ISSUE III

Facts specific to Issue III

The court-martial was decided on July 21, 1998.  The convening authority acted on August 6, 1999.  The record was

---

[12] The new M.R.E. 305(e) does not address the ethical implications of dealing with accuseds or suspects who are represented by counsel.  See generally M.R.E. 305(e).

18

United States v. Finch, No. 05-0435/MC

sent to the Navy-Marine Corps Court of Criminal Appeals (NMCCA) on January 28, 2000, and docketed on March 1, 2000. The defense filed twenty motions for enlargement between July 5, 2000, and May 31, 2002, when their brief was filed. The Government filed eight motions for enlargement; the last one was filed on March 26, 2003. The defense did not oppose any of the Government enlargements until April 2, 2003. The Government brief was filed with the court below on May 19, 2003. On November 18, 2004, the defense filed a motion for expedited review. Finally, on March 10, 2005, the NMCCA delivered its opinion.

Discussion

We review claims of post-trial and appellate delay using the four-factor analysis from Barker v. Wingo, 407 U.S. 514, 530 (1972). United States v. Moreno, 63 M.J. 129, 135 (C.A.A.F. 2006).[13] If there has been a denial of due process, an appellant is entitled to relief unless the Court is convinced that the error was harmless beyond a reasonable doubt. United States v. Toohey, 63 M.J. 353, 363 (C.A.A.F. 2006). Where we can determine that any violation of the due process right to speedy post-trial review and appeal is harmless beyond a reasonable doubt, we need not undertake the four-factor Barker analysis

---

[13] I apply the analysis from the majority opinion in Moreno, but see Moreno, 63 M.J. at 144-52 (C.A.A.F. 2006) (Crawford, J., concurring in part and dissenting in part).

prior to disposing of that post-trial or appellate delay issue. See United States v. Allison, 63 M.J. 365, 370-71 (C.A.A.F. 2006).  In this case, we conclude that even if Appellant was denied his due process right to speedy review and appeal, that error was harmless beyond a reasonable doubt and no relief is warranted.

CONCLUSION

For the reasons stated above, we affirm the decision of the United States Navy-Marine Corps Court of Criminal Appeals.

United States v. Finch, No. 05-0453/MC

GIERKE, Chief Judge (concurring in part and dissenting in part):

I dissent from my colleagues' treatment of Issues I and II; however I join Judge Erdmann's separate opinion concurring in the result on Issue III.

ISSUE I

> No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal.[1]

I respectfully dissent from the majority opinion because changing the overt act by exceptions and substitutions resulted in a material variance, which altered the very nature of the offense, such that Appellant was denied this fundamental principle of due process.

The Manual for Courts-Martial describes the two distinct elements of conspiracy:

(1) That the accused entered into an agreement with one or more persons to commit an offense under the code; and

(2) That, while the agreement continued to exist, and while the accused remained a party to the agreement, the accused or at least one of the co-conspirators performed an overt act for the purpose of bringing about the object of the conspiracy.[2]

---

[1] Cole v. Arkansas, 333 U.S. 196, 201 (1948).
[2] Manual for Courts-Martial, United States pt. IV, para. 5.b. (2005 ed.) (MCM).

Thus, the overt act is an essential element of the offense, which must be alleged and proven beyond a reasonable doubt. In this case, the military judge, without any notice to the accused, announced findings by exceptions and substitutions to overt acts that were not alleged in, or implied by, the specification charged. The alteration of the charge by the military judge constituted a fatal variance in the pleadings and materially prejudiced Appellant's ability to defend against the charge of conspiracy.

Appellant was originally charged with conspiracy to provide alcohol to persons involved in the delayed entry program. Two specific overt acts were alleged in the specification: (1) purchasing beer at a service station, and (2) transporting that beer to the [T] residence.

After hearing all the evidence, the military judge found Appellant not guilty of the overt acts alleged. The military judge then proceeded, by exceptions and substitutions, to find Appellant guilty of two new, distinct overt acts, namely that: (1) Appellant, Staff Sergeant Teffeau, and [JK] agreed to drive to the Winfield City Lake to drink beer at the lake, and (2) they then drove to the lake in two separate cars and drank beer. The specification as amended by the military judge's announced findings focused on two allegations of fact: an agreement to drive to the lake and drinking beer at the lake. The charge

2

originally alleged made absolutely no mention of either of these allegations.

The majority quotes United States v. Hunt, which states, "To prevail on a fatal-variance claim, appellant must show that the variance was material and that it substantially prejudiced him."[3] An accused can show prejudice from a material variance in several ways. One way includes a showing of a due process violation "where he was 'misled to the extent that he has been unable adequately to prepare for trial . . . or where the variance at issue changes the nature or identity of the offense and he has been denied the opportunity to defend against the charge.'"[4]

Appellant and his counsel prepared a defense and presented evidence to refute the overt acts alleged by the Government. This defense was directed at demonstrating that the overt acts alleged occurred before any criminal agreement took place. Specifically, Appellant presented evidence at trial that the purpose of purchasing beer at a service station was for consumption during that weekend's football playoff games. The military judge's verdict indicates that Appellant and his counsel were successful in their defense to the offense as alleged.

---

[3] 37 M.J. 344, 347 (C.M.A. 1993).
[4] United States v. Teffeau, 58 M.J. 62, 67 (C.A.A.F. 2003) (quoting United States v. Lee, 1 M.J. 16 (C.M.A. 1975)).

In United States v. Collier, this Court held "[a] variance between a single overt act averred in an indictment and the act proved at trial may constitute harmless error beyond a reasonable doubt."[5]  "'Substantial similarity between the facts alleged in the overt act and those proved is all that is required.'"[6]  In Collier, this Court concluded the proven overt act of leaving the squad bay was substantially similar to the alleged overt act of leaving the barracks in furtherance of the agreement to rob junior Marines at the back gate of Camp Geiger.[7] The terms "squad bay" and "barracks" are sometimes used synonymously.  A person standing in the squad bay of a squad-bay type of barracks has to leave the squad bay before he or she can exit the barracks. Thus, the act of leaving the squad bay was included in and implied by the act alleged, leaving the barracks.

This case is distinguishable from Collier.  Here, the alleged overt acts of buying beer and traveling to a private residence, which Appellant successfully defended against, are not substantially similar to, included in, or implied by the substituted acts of driving to a lake and drinking a beer at the lake.  The changing of the overt act element of the conspiracy

---

[5] United States v. Collier, 14 M.J. 377, 380 (C.M.A. 1983).
[6] Id. (quoting Strauss v. United States, 311 F.2d 926, 932 (5th Cir. 1963)).
[7] See id.

4

charge did not constitute harmless error. On the contrary, it altered the language of the alleged overt act element in a manner which produces a material variance. Appellant was substantially prejudiced by this material variance because he was denied the opportunity to defend against the charge. Appellant was successful in preparing and presenting a defense to the crime charged by the Government. He should have had an opportunity to prepare a defense to the substantially different charge created by the military judge when he announced his findings of guilt.

The majority's decision on Issue I is particularly troublesome because it focuses on the fact that Appellant did not object to the announcement of the verdict. The majority therefore concludes that the military judge's error in altering the nature of the charge is waived by the failure to object unless the error is deemed to be plain or "clear" error.

I have not been able to find any criminal case from any jurisdiction which places a requirement on the defendant to object to the verdict in order to preserve a legal issue for appeal. Indeed, the entry of a plea of not guilty should provide ample notice that a defendant would oppose and object to any findings of guilt. I therefore disagree with any notion that an accused is expected to object to findings of guilt after they are announced. Appellant did not waive this issue by a

5

failure to object to the announcement of findings and the error warrants reversal.

Accordingly, I respectfully dissent.

ISSUE II

I also dissent from the majority decision to overrule United States v. McOmber,[8] because doing so will "utterly defeat the congressional purpose of assuring military defendants effective legal representation without expense."[9] McOmber held that "once an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31(d) of the Uniform Code."[10] This also includes "questioning with regard to the accused's future desires with respect to counsel as well as his right to remain silent, for a lawyer's counseling on these two matters in many instances may be the most important advice ever given his client."[11] The McOmber rule was codified in the Military Rules of Evidence and titled "Notice of Counsel." It read:

---

[8] United States v. McOmber, 1 M.J. 380 (C.M.A. 1976).
[9] Id. at 383. (citing Article 27, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 827 (2000)).
[10] Id.
[11] Id.

When a person subject to the code who is required to give warnings under subdivision (c) intends to question an accused or person suspected of an offense and knows or reasonably should know that counsel either has been appointed for or retained by the accused or suspect with respect to that offense, the counsel must be notified of the intended interrogation and given a reasonable time in which to attend before the interrogation may proceed.[12]

In 1994, the President amended M.R.E. 305(e) to remove the McOmber notice requirement.[13] McOmber was a statutorily based decision, and the underlying statute, Article 27, UCMJ, has not changed. "The President. . . cannot overrule or diminish an Act of Congress via the promulgation of rules of procedure. Likewise, the President cannot overrule or diminish our interpretation of a statute."[14] Thus, Article 27, UCMJ, and our decisions interpreting and applying it "reign[ ] preeminent over anything propounded by the President."[15]

The majority bases its conclusion that the President can overrule McOmber on the idea that McOmber was not an application and interpretation of Article 27, UCMJ, but rather an attempt to ensure that Article 27, UCMJ, was administered in a manner consistent with parallel developments in civilian constitutional law. The majority apparently draws this conclusion from the reference to constitutional "overtones" in the McOmber opinion.[16]

---

[12] Military Rule of Evidence (M.R.E.) 305(e) (1994).
[13] M.R.E. 305(e) (2005).
[14] United States v. Kossman, 38 M.J. 258, 260-61 (C.M.A. 1993).
[15] Id.
[16] McOmber, 1 M.J. at 382.

It is important to put that phrase in context to understand that the decision was directly based on Article 27, UCMJ.  What this Court said was, "Although the question presented has certain constitutional overtones, <u>our disposition of the matter on statutory grounds</u> makes it unnecessary to resolve the Sixth Amendment claim."[17]  Judge Cook's concurring opinion is even more explicit in rejecting any notion that civilian constitutional precedent was being followed.  Judge Cook cites two federal cases which have allowed questioning without counsel's presence and then states, "As the principal opinion observes, however, <u>our cases have leaned squarely in the opposite direction.  It may, indeed, be time to prescribe the strong medicine of explicit disapproval</u>."[18]  Accordingly, the majority opinion's conclusion that <u>McOmber</u> was crafted to follow developments in constitutional law is contradicted by the very language of the <u>McOmber</u> decision.

In many instances servicemembers are afforded more rights in the criminal justice system than their civilian counterparts.[19]  For example, the rights advisement required by

---

[17] <u>Id.</u> (emphasis added).
[18] <u>Id.</u> at 383 (Cook, J., concurring) (emphasis added and quotation marks omitted).
[19] <u>See</u> <u>United States v. Warner</u>, 62 M.J. 114, 121 n.31 (C.A.A.F. 2005), which states:

> In defining the rights of military personnel, Congress was not limited to the minimum requirements established by the

8

Article 31, UCMJ,[20] predates Miranda v. Arizona[21] by sixteen years, and the protections afforded servicemembers by Article 31, UCMJ, are, in some respects, even more expansive than those required by Miranda.[22] Similarly, this Court, focusing on the differences between a court-martial and a civilian jury trial, has held that a military defendant is entitled to "a reasonable, racially neutral explanation" for a prosecutor's challenge of a minority member of a court-martial, while a civilian defendant is not.[23]

The majority opinion fails to recognize that McOmber was based on the interpretation of a statute crafted by Congress to address special military circumstances. As Congress recognized in drafting Article 31, UCMJ, it is appropriate that more protection be afforded to servicemembers in the interrogation setting than to their civilian counterparts because of the

---

Constitution, and in many instances, it has provided safeguards unparalleled in the civilian sector. United States v. Mapes, 59 M.J. 60, 65 (C.A.A.F. 2003) (quoting United States v. McGraner, 13 M.J. 408, 414 (C.M.A. 1982) (quotation marks omitted)); see, e.g., Francis A. Gilligan, The Bill of Rights and Service Members, 1987 Army Law. 3, 10 (Dec. 1987) (servicemembers' rights broader than constitutionally required).

[20] 10 U.S.C. § 831 (2000).
[21] Miranda v. Arizona, 384 U.S. 436 (1966).
[22] H. F. "Sparky" Gierke, The Use of Article III Case Law in Military Jurisprudence, Army Law., Aug. 2005, at 25, 36.
[23] United States v. Tulloch, 47 M.J. 283, 287 (C.A.A.F. 1997) (declining to follow the Supreme Court's holding in Purkett v. Elem, 514 U.S. 765, 769 (1995), that the explanation for the challenge need not "make[ ] sense").

characteristically coercive nature of the military. The prophylactic rule announced in McOmber was intended to ensure the right to effective assistance of counsel set forth in Article 27, UCMJ, and to extend that right to servicemembers facing an interrogation into allegations of misconduct.

The recognition that the military environment is inherently coercive is substantiated by the very facts of this case. It cannot be ignored that Appellant, with the assistance of counsel, was able to successfully invoke his rights in several attempted interrogations by civilian police, but eventually agreed to waive his rights when confronted by a military superior for the second time. The military setting, the influence of rank, and the absence of the assistance of counsel almost certainly created an environment in which Appellant's ability to invoke the rights previously asserted was compromised.

The rights afforded by Article 27, UCMJ, and McOmber are separate and distinct from the constitutional rights addressed in Minnick v. Mississippi[24] and McNeil v. Wisconsin.[25] The change

---

[24] Minnick v. Mississippi, 498 U.S. 146 (1990) (holding that once a suspect has requested counsel, interrogators may not reinitiate questioning unless the attorney is present, regardless of whether or not there has been an outside consultation).

[25] McNeil v. Wisconsin, 501 U.S. 171 (1991) (finding that the assertion of the Sixth Amendment right to counsel did not imply an assertion of the Miranda right to counsel).

to M.R.E. 305(e), removing the McOmber protections prior to preferral of charges, was enacted to apply Minnick and McNeil.[26] But, in the military environment, counsel rights extending beyond those in civilian society are particularly important. Our country has soldiers, sailors, airmen, and marines deployed in every corner of the globe for extensive periods of time. In these remote areas, they may find themselves facing investigations into allegations of criminal conduct for months, even years, before a charge can be preferred.[27] These young men and women deserve unique protections to ensure that they receive the effective assistance of counsel in the unique circumstances they face as a result of their military service. McOmber is based on military-specific statutory provisions designed to protect this important right to counsel rather than the constitutional provisions involved in Minnick and McNeil. Since a change in a rule cannot supplant a statute, including a statutorily based judicial decision,[28] the attempt to overrule McOmber by amending the Military Rules of Evidence should fail. Accordingly, I dissent from the majority's decision to overrule

---

[26] Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-15 through A22-16 (2005 ed).

[27] See United States v. Wattenbarger, 21 M.J. 41, 42-45 (C.M.A. 1985) (finding a pre-preferral right to counsel in a situation where a sailor stationed overseas was facing allegations of criminal behavior for four months prior to preferral of any charges).

[28] Kossman, 38 M.J. at 260-61.

McOmber, based on the holdings of Minnick and McNeil, and the changes to M.R.E. 305(e).  I would also overrule those portions of M.R.E. 305(e) which are inconsistent with McOmber.

In addition to overruling McOmber, the majority alternatively concludes that Appellant waived any McOmber protections that he was afforded.  In reaching this conclusion, the majority relies on United States v. LeMasters, which found a proper waiver of McOmber rights.[29]  Because I concurred in LeMasters, I think it is important to note the significant factual distinctions between that case and this one.

The appellant in LeMasters contacted the Office of Special Investigations (OSI) office on his own accord on four separate occasions without requesting counsel, and he made statements each time.[30]  In LeMasters, prior to taking the appellant's statement, a special agent in the OSI office instructed the appellant to contact his attorney, and the agent provided the appellant with an office, a phone, and the phone number of the area defense counsel's office.[31]  The interrogation proceeded only after LeMasters returned to the agent and indicated that he had spoken with counsel and desired to continue without counsel present.[32]

---

[29] 39 M.J. 490, 493 (C.A.A.F. 1994).
[30] Id. at 491.
[31] Id.
[32] Id.

In stark contrast to LeMasters, who initiated four separate discussions with law enforcement, Appellant here never initiated an interrogation session and, through counsel, declined to speak with the Winfield City Police Department.  In furtherance of law enforcement's continuing effort to successfully interrogate Appellant, Detective Shaw, the civilian police officer, worked with Captain (CPT) Montgomery, the military officer investigating Appellant.  Detective Shaw told CPT Montgomery that Appellant was represented by a "hot shot lawyer." Detective Shaw, who had been unable to question Appellant because of his invocation of rights, provided CPT Montgomery with a list of questions to ask.  On March 12, 1997, CPT Montgomery, without making any effort to contact Appellant's lawyer or to give Appellant the opportunity to do so, gave Appellant the standard rights acknowledgment warning and obtained a waiver of Appellant's Miranda rights and Article 31, UCMJ, rights.[33]

The Court in LeMasters ruled that the Appellant had waived his rights because "there is no evidence of police overreaching or badgering or attempting to surreptitiously deprive appellant

---

[33] The standard "Miranda waiver" should not equate to a waiver of McOmber rights because, as we pointed out in McOmber, the notification to counsel was required prior to "questioning with regard to the accused's future desires with respect to counsel as well as his right to remain silent, for a lawyer's counseling on these two matters in many instances may be the most important advice ever given his client."  1 M.J. at 383.

of the right to counsel.  Rather, this is a case in which appellant intended to give a statement . . . to the OSI agents. This discourse was initiated by appellant and not by the agents."[34]

The facts of this case indicate that Appellant had no desire to be interrogated and would not have done so absent the repeated law enforcement efforts to subvert his invocation of rights.  In LeMasters, law enforcement recognized and protected the accused's McOmber rights.  In the instant case, law enforcement ignored and attempted to maneuver around the undisputed fact that Appellant was represented by counsel. These facts support the rationale for McOmber, not the majority's decision to overrule that important military case.  I therefore respectfully dissent.

---

[34] 39 M.J. at 492 (quotation marks omitted).

ERDMANN, Judge (concurring in part and dissenting in part):

I concur with the majority on Issue II.  I join the Chief Judge's dissent with respect to Issue I.

Finally, I concur in the result on Issue III.  I conclude that even though Finch should have prevailed on a meritorious substantive issue, he did not suffer any prejudice under the fourth prong of the appellate delay analysis.  See United States v. Toohey, 60 M.J. 100, 102 (C.A.A.F. 2004) (adopting the speedy trial factors from Barker v. Wingo, 407 U.S. 514, 530 (1972), for post-trial and appellate delays).  Although I would have authorized a rehearing on the specification of Charge I and the sentence, any delay in processing this appeal did not result in oppressive incarceration.  See United States v. Moreno, 63 M.J. 129, 139 (C.A.A.F. 2006).  Finch would have been released after serving the adjudged five months of confinement well before a timely appeal could have been completed.  Further, although the delay in this case may have impaired Finch's ability to present a defense at a rehearing, he has "not . . . identi[fied] any specific harm that he would encounter at a rehearing."  Id. at 141.  For those reasons, I would conclude that Finch was not prejudiced under the fourth Barker factor.

I would, however, find a violation of Finch's due process right to speedy post-trial and appellate review.  The 2,424 days (six years, seven months and twenty days) from sentencing to

completion of Finch's appeal of right is excessive and is "so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." United States v. Toohey, 63 M.J. 353, 362 (C.A.A.F. 2006). However, I share the majority's conclusion that this due process violation was harmless beyond a reasonable doubt. See id. at 363.